**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **BRYAN MYGRANT and** ) | |
| **JONATHAN WEBBER,** ) | **Civil Action No.** |
| on behalf of themselves and all other ) | |
| similarly situated employees, ) | **Collective Action** |
| ) | |
| **Plaintiffs,** ) | **Jury Demand** |
| ) | |
| v. ) | |
| ) | |
| **GULF COAST RESTAURANT** ) | |
| **GROUP, INC.,** ) | |
| **HALF SHELL OYSTER HOUSE, INC.,** ) | |
| **and ROBERT TAYLOR d/b/a** ) | |
| **HALF SHELL OYSTER HOUSE** ) | |
| ) | |
| **Defendants,** ) | |

**COLLECTIVE ACTION COMPLAINT**
**UNDER THE FAIR LABOR STANDARDS ACT**

Named Plaintiffs Bryan Mygrant (hereinafter "Mygrant") and Jonathan Webber (hereinafter "Webber")(hereinafter collectively "Plaintiffs") file this Collective Action Complaint pursuant to 29 U.S.C. §216(b), on behalf of themselves and all other similarly situated employees, against Defendants Gulf Coast Restaurant Group, Inc. (hereinafter "Defendant GCRG" or "GCRG"), Defendant Half Shell Oyster House Inc., (hereinafter "Defendant HS Inc."), and Defendant Robert Taylor (hereinafter "Defendant Taylor" or "Taylor") doing business as Half Shell Oyster House (hereinafter "Half Shell").

**I.    Jurisdiction and Parties**

1.      Plaintiffs bring this action, on behalf of themselves and all other similarly situated employees of Defendants, pursuant to the FLSA's collective action provision found at 29 U.S.C. §216(b).

1

2. At all times material to this action Defendants were Plaintiffs' employer as defined by 29 U.S.C. §203(d) of the FLSA, as well as the employer of all other employees similarly situated to Plaintiffs.

3. At all times material to this action, Defendants were an enterprise engaged in related activities performed through unified operation and common control for a common business purpose as defined in 29 U.S.C. § 203(r)(1).

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331. Venue is proper in the Southern District of Alabama, pursuant to 28 U.S.C. §1391(b).

5. Defendant Robert Taylor is the founder, owner, of GCRG, HS Inc., and all related companies doing business under the Half Shell Oyster House banner.

6. Defendant Taylor directly and indirectly exercises management control over the operations of GCRG, HS Inc., and all restaurants operating under the Half Shell Oyster House banner.

7. Defendant Taylor's control extends to employment and pay policies, practices, and procedures.

8. Both Plaintiffs were employed at the Half Shells restaurant location in Mobile, Alabama.

9. Plaintiff Mygrant resides in Mobile, Alabama.

10. From approximately March 15, 2015 until May 2017 Plaintiff Mygrant was employed by Defendants.

11. Plaintiff Webber resides in Mobile, Alabama.

12. From approximately March 15, 2015 until May 2017 Plaintiff Webber was employed by Defendants.

13. While employed by Defendants Plaintiffs were assigned to work shifts in the positions of (1) server; or (2) food expo.

14. Defendants paid Plaintiffs, and all other similarly situated employees, a direct wage less than the $7.25 per hour required by the FLSA for all hours worked as a server or food expo.

15. Defendants claimed a tip credit for Plaintiffs, and all other similarly situated employees, when working as a server or food expo.

16. At all times material to this action, each of the Plaintiffs, and all other similarly situated employees, were employees of the integrated enterprise comprised of Defendants.

17. Each of the Defendants are subject to personal jurisdiction in the State of Alabama for the purpose of this lawsuit given their integrated enterprise includes two restaurant locations in the state, including one in Mobile and another in Spanish Fort.

18. At all times material time to this action Defendants performed related activities through the common control by Defendant Taylor for Half Shell's common business purpose.

19. The tip credit, minimum wage and overtime provisions set forth in 29 U.S.C §203(m), §206 and § 207, respectively, of the FLSA apply to Defendants.

20. Plaintiffs, and all other similarly situated employees, were covered by 29 US.C. §203(m), §206 and §207 of the FLSA while they were employed by Defendants.

21. At all times material to this action, Defendants operated each location, performing related activities, through common control as an integrated enterprise engaged in commerce or in the production of goods for commerce as defined by § 203(s)(1) of the FLSA and have an annual gross volume of sales which greatly exceeds $500,000.

22.     The Plaintiffs, and all other similarly situated employees employed by Defendants, were individually engaged in interstate commerce and/or the production of goods for interstate commerce while working for Defendants. Their interstate commercial activity included, but was not limited to, serving customers who were traveling in interstate commerce, serving food that originated out of state, and processing credit card transactions that crossed state lines.

23.     Plaintiffs seek to recover unpaid (or underpaid) minimum and overtime wages, an equal amount of liquidated damages, costs, and attorneys' fees, and seek all other legal or equitable relief to which they, and other similar situated employees who join this action, are entitled.

## II.     Factual Background

24.     Defendants GCRG and/or HS Inc. owns, manages, and operates all restaurants operating under the Half Shell Oyster House banner.

25.     Half Shell is GCRG and/or HS Inc.'s flagship brand started with a single restaurant in Gulfport, Mississippi and expanded into an integrated enterprise with 10 locations.

26.     Defendant Taylor, along with Rob Heffner, Kevin Fish, and Brian Raspberry are the principle shareholders or partners in GCRG.

27.     Defendant Taylor is the founder and president of GCRG and started the integrated enterprise in the summer of 2009 by opening the first Half Shell in Gulfport, Mississippi.

28.     Since that time, Defendants have opened and continue to operate Half Shell locations in Biloxi Mississippi; Sarasota Florida; Hattiesburg Mississippi; Mobile, Alabama; in the Hard Rock Casino in Biloxi Mississippi; Flowood, Mississippi; Spanish Fort, Alabama; Lafayette, Louisiana; and, Destin, Florida.

29. The "Home Office" maintains centralized and common control over (a) accounting; (b) payroll; (c) invoicing; and (d) insurance and human resources (hereinafter referred in the aggregate as "Central Administration"). (Exhibit A Contact Us Page).

30. GCRG maintains common management of the Half Shell brand through the following management team: (a) Bob Taylor, President; (b) Kevin Fish, Vice President – Real Estate; (c) Brian Raspberry, Vice President – Construction; (d) Rob Heffner, Vice President – Purchasing (hereinafter referred in the aggregate as "Central Management").

31. GCRG maintains and operates a common website to market the Half Shell Brand to the public, including a common information on its webpages including: (a) Home; (b) About Us; (c) Gift Cards; and (d) contact us page.

32. GCRG uses the common website to solicit applicants and advertise positions for all the Half Shell locations.

33. GCRG markets the Half Shell brand to the public through the common website, including presenting menus, gift cards, and promotions.

34. Each location has General Managers that report to Area Directors
    a. Dino Mirando is over Hattiesburg, Flowood and Lafayette locations (Exhibit A Contact Us page);
    b. John Graham is over Gulfport, Biloxi, Mobile, Hard Rock-Biloxi, and Destin locations; and,
    c. Kevin Fish is over the Sarasota location.

35. Defendants through their various business entities employs hundreds of individuals as servers who provide customer service to restaurant customers.

5

36. Defendants claimed the maximum tip credit of $5.12 per hour for servers at its Mobile location.

37. Defendants required servers to purchase long sleeve button down shirt with the Half Shell logo from the restaurant (hereinafter "Uniform Shirts").

38. Defendants also required servers to purchase aprons from the restaurant (hereinafter "Uniform Aprons").

39. Defendants required servers to maintain the Uniform Shirts and Uniform Aprons in clean sanitary condition and were required to maintain and replace in conformance with the Defendants' standards.

40. Defendants required servers to purchase non-slip shoes bearing the certification.

41. Defendants required servers to purchase tools of the trade such as pens they used to write customer orders and wine tools.

43. Defendants' servers were subject to inspections, which could happen on any day and typically took place once or twice per week.

44. Defendants required servers to pay other of Defendants business expenses, such as paying for meals when customers left without paying and paying for ordering mistakes.

45. Defendants did not reimburse their servers for the servers' out-of-pocket expenses related to Defendants' business expenses such as the purchase, maintenance, and replacement of Uniform Shirts, Uniform Aprons, non-slip shoes, tools of the trade, paying for meals of customers who left without paying, and paying for ordering mistakes.

46. Defendants' servers were required to study and pass a menu test which consisted of learning the specific ingredients offered on the restaurants extensive menu.

47. Defendants' servers took the test during the hiring process and once a year. It could span several hours.

48. Defendants' servers were also required to take a monthly menu test that focused on new or featured menu items.

49. Defendants' servers were not compensated for time spent studying for or taking any of these menu tests.

50. Defendants' servers claimed a tip credit for all server hours and imposed a mandatory tip out scheme on servers that was based on their total food and beverage sales.

51. Defendants did not comply with all the pre-requisites to claiming a tip credit pursuant to 29 U.S.C. §203(m).

52. Defendants used a formula that required their servers to tip out four percent (4%) to other employees, including busser, bartender, and food expeditor.

53. Defendants also required servers to tip out a minimum of $5.00 to food runners.

54. The food expo position was assigned to individuals who also worked as servers and other positions on other shifts.

55. When Defendants' employees worked as a food expo they only worked as a food expo during that shift.

56. Defendants claimed a tip credit for the individual(s) working in the food expo position(s) and required servers to tip out to that person.

57. Individuals working in the food expo position worked behind closed doors in an area known as the main kitchen.

58. Individuals working in the food expo position did not wear the Uniform Shirt or Uniform aprons that Defendants' servers wore.

59. Individuals working the food expo position wore black shirts and black hats like other employees working in the main kitchen.

60. Individuals working in the food expo position did not leave the main kitchen to interact with customers.

61. Any interaction that a food expo person may have with customers was rare and not part of the job duties of the position.

62. Individuals working in the food expo position were not visible to customers as they worked in the main kitchen as it was off-limits to the public.

63. Defendants' servers reported for their shifts on a staggered basis, generally in three groups.

64. The earliest reporting server group, known as "Openers" arrived one hour before the restaurant opened its doors to the public.

65. The next reporting server groups were generally scheduled to arrive one half hour before the restaurant opened their doors to the public or shortly before or at the time the restaurant opened their doors to the public.

66. Defendants' servers were responsible for completing certain duties before they were allowed to serve customers.

67. Openers were required to complete numerous duties during this pre-customer time, including, without limitation, the following:

   a. setting up the expo well, which involves making an ice bath to keep condiments cold (this needs to be re-iced between shifts);

   a. transporting ice to soda stations and changing pans;

    b.    preparing various sauces (cocktail, tarter, aioli sauce), lemons, limes, and bottles of lemon pepper aioli;

    c.    preparing sweet and unsweetened teas;

    d.    cutting French bread – approximately 20 loaves;

    f.    setting up the dining room – including rolling silverware, wiping down and stocking tables, retrieve water pitchers, straining chairs and tables;

    g.    setting up the oyster station – bringing out lemons, cocktail sauce, horseradish, transport ice for ice bath, retrieve and transport oyster forks, inspect and polish;

    h.    filling nine water urns; and,

    i.    detailing booths.

68.    As other servers arrived they would help the Openers in completing these pre-customers serving tasks.

69.    Customers were not immediately seated in every server's sections upon opening restaurant doors to the public.

70.    Customers were seated in server sections starting with the first two rounds being seated in the Openers' sections, customers could then be seated in the later arriving servers' sections.

71.    Servers were expected to continue performing pre-customer serving tasks until a customer was seated in their section.

72.    Defendants claimed a tip credit for all this pre-customer time.

73.    Defendants did not track the amount of time servers performed pre-customer duties before having customers seated in their section to serve.

74. As the customer traffic decreased, the restaurant released servers from their serving duties, by no longer seating new customers in their sections, this is commonly referred to as "cutting servers."

75. The cutting of servers started with the Openers.

76. The Openers were then assigned to post-customer serving tasks based on business needs.

77. As with the pre-shift server duties, as each server was cut they were responsible for helping complete the post-customer tasks started by the Openers.

78. Before servers were released from their shift they had to have their side work inspected and approved by the Closer.

79. Defendants did not track the amount of time for the period between the time the server stopped serving customers and were released from the end of their shift.

80. Defendants claimed a tip credit for this post-customer serving time.

81. Servers arriving for the evening shift arrived in the same or similar staggered fashion and performed the same or similar pre-customer serving job duties before serving customers.

82. The final group of servers arriving for the evening shift were called "Closers."

83. Servers finishing their evening shift were cut in the same or similar staggered fashion.

84. Servers finishing their evening shift were given work assignments that included, without limitation, the following:

    a. rolling fifty sets of silverware in cloth napkins;

   b. inspecting table settings for sanitation and presentation purposes, resulting polishing items before rolling;

   c. filling expo station;

   d. cleaning trays; and,

   e. disassembling beverage urns;

85. In addition to the post-customer duties on the evening shift the Closers were required to sweep and mop the floors.

86. Defendants required servers to print out reports of their food and beverage sales for the administration of the tip out.

87. Defendants claimed a tip credit for time spent waiting and performing the administration of the tip out.

88. Defendants did not track the hours spent by servers performing these post-customers serving time.

89. Defendants did not track the amount of time spent between servers closing their last ticket and when they were released from their shift.

90. Defendants did not track to the pre- and post- customer serving time to ensure that they compensated servers the full minimum wage when it exceeded twenty percent of their work time.

91. Servers pre- and post- customer serving time would exceed twenty percent of their work time on a regular basis.

92. Defendants' tip-sharing, timekeeping and payroll policies and practices resulted in the misapplication of the tip credit.

93. Defendants failed to satisfy the requirements necessary to claim a tip credit.

94. Defendants required servers to share tips with employees who worked in positions that did not regularly and customarily receive $30 in tips from customers independent of the tip out scheme.

95. Defendants charged servers for unpaid bills known as "walk offs," after the first time, and were responsible for paying half the menu price of unpaid items out-of-pocket.

96. Defendants charged servers for order mistakes, Defendants charged up to the full menu price of items.

97. Defendants requiring Plaintiffs and all other similarly situated employees to absorb the Defendants business expenses, including, without limitation, the purchase of Uniform Shirts, Uniform Aprons, other tools of the trade, paying for walk offs and ordering errors, resulted in minimum wage and overtime violations as it constituted an unlawful kick and violated the free and clear requirements of the FLSA in the weeks those expenses were incurred and a violation of the tip credit requirements.

98. Defendants failed to pay employees the mandated minimum wage for time they spent performing non-tip producing work (per- and post- customer serving time) that exceeded twenty percent of their work time.

99. Defendants did not pay the employees the required minimum wage for time spent studying and taking the menu tests.

100. Defendants failed to compensate employees for time spent maintaining their Uniform Shirts and Uniform Aprons in a condition satisfactory to the restaurant standards.

101. Plaintiffs, on behalf of themselves and all similarly situated employees, seek all unpaid minimum wage, overtime compensation, and tip money owed to them for these violations of the FLSA.

102. Plaintiffs also seek an equal amount as liquidated damages for all money owed for violations of the FLSA, including backpay and repayment of tip outs and business expenses, for themselves and all other similarly situated employees.

103. Plaintiffs also seek that Defendants pay their attorneys' fees and costs in prosecuting this case.

### III.  Fair Labor Standards Act Collective Action Allegations

104. The allegations set forth in paragraphs 1-103 are incorporated as if set forth herein.

105. Upon information and belief, Defendants have intentionally failed and/or refused to pay Named Plaintiffs and all other similarly situated employees according to the provisions of the FLSA.

106. Defendants' actions in failing to compensate the Named Plaintiffs, as well as those similarly situated, in accordance with the provisions of the FLSA were willful so that a three-year statute of limitations should apply to this action.

107. Upon information and belief, the policies and practices set forth in this complaint are standard, company-wide policies and practices that apply to all servers at all of Defendants' locations.

108. The violations of the FLSA alleged herein are the result of common practices with respect to corporate management decisions with respect to tip pooling, time tracking, payroll, and what expenses should be passed on to the Defendants' employees.

109. Defendants' practice of requiring Plaintiffs and similarly situated servers and other employees to absorb Defendants' business expenses including by purchasing (and maintaining) uniforms, tools of the trade, paying for walk offs or ordering mistakes constitutes a

*de facto* wage deduction and/or illegal kickback of wages or tips in violation of the FLSA. Defendants' policies and practices of shifting their business expenses to Plaintiffs violate the FLSA's tip credit, the "Free and Clear" payment and anti-kickback regulations, minimum wage and overtime provisions. Accordingly, Defendants are not entitled to claim the tip credit in any workweek in which they shifted their business expenses to Plaintiffs. Rather Defendants owe Plaintiffs and the putative class members the full minimum wage and must reimburse the actual costs of the expenses incurred by Plaintiffs and the putative class members.

110. Defendants' policies and practices related to the tips and wages of the Plaintiffs and all other similarly situated employees disqualify them from claiming the tip credit provisions of the FLSA such that Defendants owe the full minimum wage for all hours worked and must reimbursement of all tips that were improperly taken by Defendants pursuant to their illegal tip-sharing arrangement.

111. Defendants failed to pay Plaintiffs and the putative class for all hours worked, including, without limitation, off the clock work in the restaurants, time spent maintaining uniforms and time spent studying for and taking menu tests, thereby violating the minimum wage and overtime provisions of the FLSA.

112. Defendants improperly claimed a tip credit for duties not related to Plaintiffs' and the putative class members' tipped duties, such as food preparation and janitorial work. Such duties should have been compensated at the full minimum wage regardless of the amount of time spent performing these duties.

113. Defendants knew or should have known that Plaintiffs and similarly situated employees performed work for which they were not compensated or not properly compensated.

114. Defendants' policies and practices described herein violate the minimum wage, overtime and tip credit provisions of the FLSA.

115. There are numerous similarly situated employees of Defendants – specifically, all employees who worked as servers or for whom Defendants have claimed a tip credit at any time since June 6, 2015 –  who have been improperly compensated in violation of the FLSA.

116. These similarly situated employees would benefit from the issuance of Court-Supervised Notice of and the opportunity to join this lawsuit.

117. These similarly situated employees are known to Defendants, are readily identifiable and can be located through Defendants' records.  Timely notice would benefit these workers and the public interest in ensuring compliance with the FLSA.  Therefore, this Court should approve notice to the putative class.

## IV.   PRAYER FOR RELIEF

WHEREFORE, premises considered, the named, Named Plaintiffs, individually, and on behalf of all other similarly situated persons, pursuant to 29 U.S.C. § 216(b), pray for the following relief:

1. that process issue against Defendants and that the Defendants be required to answer within the time period provided by applicable law;

2. that the Court order that Plaintiffs may issue notice to all similarly situated persons;

3. that other similarly situated past or present employees be given the opportunity to join in this lawsuit as party-plaintiffs by filing written consents pursuant to 29 U.S.C. § 216(b);

4. that Plaintiffs, and all others who file consents, be awarded damages in the amount of their unpaid wages, and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b), and/or prejudgment interest;

5. that Defendants be required to pay Plaintiffs' attorneys' fees;

6. that Defendants be required to pay the costs and expenses of this action;

7. that Plaintiffs and all others who join this action be granted such other, further and general relief to which they may show themselves entitled; and,

8. that a jury be impaneled to hear this cause of action at trial.

## VI.    JURY DEMAND

THE PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY.

Respectfully submitted,

**/s/ Daniel E. Arciniegas**
Daniel E. Arciniegas
ARCINIEGAS LAW PLLC
100 Reliance Drive
Franklin, Tennessee 37067
Telephone (629)777-5339
Daniel@attorneydaniel.com
Counsel for Plaintiff

Charles P. Yezbak, III*
YEZBAK LAW PLLC
2002 Richard Jones Road, Suite B-200
Nashville, TN 37215
Telephone: 615-250-2000
Fax: 615-250-2020
yezbak@yezbaklaw.com
Counsel for Plaintiff

*Pro Hac Vice Motion Incoming